## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

DOMINGO VELAZQUEZ CASILLAS, et
al,
  Plaintiffs,

v.

FOREST LABORATORIES, INC.
  Defendant.

Civil No. 98-1076 (HL)

## OPINION AND ORDER

Before the Court is Defendant Forest Laboratories, Inc.'s motion for summary

judgment.  Forest is a Delaware corporation engaged in the manufacturing of

pharmaceutical products.  Up until 1997 it owned a facility in Puerto Rico known as Sein

Mendez Laboratories.  Plaintiffs Domingo Velázquez Casillas ("Velázquez"), Carlos

Matías Maldonado, Luis Pérez Aviles, Rafael Rodríguez Rivera, and Gumercinda Santiago

Maceda are former employees of Sein Mendez.[1] This dispute arises out of negotiations

between the parties to sell Sein Mendez to Plaintiffs.  The sale was not consummated, and

Plaintiffs brought this action, claiming that Forest is liable under the *culpa in contrahendo*

doctrine.[2]  The Court has jurisdiction based on diversity of the parties.[3]

---

[1] The spouses and conjugal partnerships of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodríguez Rivera are also plaintiffs.  In the interest of conciseness, the Court will use "Plaintiffs" to refer to the former Sein Mendez employees. The Court addresses the claims of the spouses and conjugal partnerships in footnote 37 below of this opinion and order.

[2] In its motion for summary judgment, Forest addresses what it considers to be a

(continued...)



Civil No. 98-1076 (HL)                2

In ruling on a motion for summary judgment, a court reviews the record in the light most favorable to the plaintiff and draws all reasonable inferences in his favor. *LeBlanc v. Great American Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993). Before proceeding to view the record through this plaintiff-friendly prism, however, it is necessary to provide some exposition on the procedural requirements for motions supporting and opposing summary judgment. A court reviewing a motion for summary judgment should consider the parties' filings to the extent that they comply with the district's local rules. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 9 n.7 (1st Cir. 1998). Puerto Rico's Local Rules require that a motion for summary judgment be accompanied by a statement of material facts "to which the moving party contends there is no genuine issue to be tried . . . properly supported by specific reference to the record." Local Rule 311(12). These facts will be deemed admitted unless the non-movant properly opposes them. *Id.* In order to demonstrate that there is indeed a genuine issue of material fact, the non-movant's opposition must also include a statement of material facts to which it contends that there are genuine issues and which are "properly supported by specific reference to the record." *Id.* Thus, the opposing

---

[2](...continued)
claim by Plaintiffs for breach of contract. Plaintiffs' amended complaint, however, does not make reference to such a theory of liability, and their opposition to the motion for summary judgment is similarly bereft of any indication that they are claiming a breach of contract. Thus, the Court treats Plaintiffs' cause of action as one solely under the *culpa in contrahendo* doctrine.

[3] 28 U.S.C.A. § 1332 (West 1993 & Supp. 1999).

Civil No. 98-1076 (HL)                3

party must make specific references to the record which establish a genuine issue of fact;

the opposing party cannot expect the court to ferret through the record to find evidence

favorable to his case. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922,

930-31 (1st Cir. 1983); *Dominguez v. Eli Lilly and Co.*, 958 F.Supp. 721, 727 (D.P.R.

1997), *aff'd*, 141 F.3d 1149 (1st Cir. 1998) (Table case).

    With these strictures in mind, the Court turns its attention to Plaintiffs' opposition to

the motion for summary judgment. Their opposition contains a statement of contested

facts. Of these contested facts, numbers 4, 8, and 13 admit certain allegations in Forest's

statement of facts. Only Plaintiffs' numbers 1, 2, 4, 6, and 10 contain citations to the

record. The remaining contested facts -- numbers 3, 5, 7, 9, 11, and 12 -- suffer from

defects. They either make allegations of fact without citation to evidence, refer only to

Plaintiffs' memorandum of law for support, or merely deny Forest's statement of fact

based on a lack of information to form an opinion or belief. A party opposing summary

judgment may not rely on unsubstantiated denials or conclusory allegations. *Magee v.*

*United States*, 121 F.3d 1, 3 (1st Cir. 1997). Nor can a party stop summary judgment

merely by insisting that the other side's evidence should not be believed. *Abbott v.*

*Bragdon*, 107 F.3d 934, 942 (1st Cir. 1997), *vacated on other grounds*, 524 U.S. 624, 118

S.Ct. 2196, 141 L.Ed.2d 540 (1998). Moreover, the allegations or arguments of counsel

are not competent to oppose summary judgment. *Nieves v. University of Puerto Rico*, 7

F.3d 270, 276 n.9 (1st Cir. 1993); *Lopez v. Corporación Azucarera de Puerto Rico*, 938

Civil No. 98-1076 (HL)                    4

F.2d 1510, 1515-16 n.11 (1st Cir. 1991). These defects in Plaintiffs' statement of

contested facts have the effect of admitting as true a number of the assertions in Forest's

statement of facts. Therefore, the only statements of facts by Plaintiffs which the Court

will consider are numbers 1, 2, 4, 6, 8, 10, and 13.

Having laid out this groundwork, the Court proceeds to a review of the record.

From 1981 to 1997, Forest owned and operated Sein Mendez Laboratories as a

manufacturing facility.[4] This facility was not a profitable one; it had been losing money

for most or all of the ten years leading up to 1996.[5] Accordingly, Forest decided in 1996 to

sell Sein Mendez. As part of this decision, it began negotiations in October 1996 with

Francisco Santos and Velázquez to sell them the facility. At the time, Santos was Sein

Mendez' senior manager, and Velázquez was its controller.[6] The price for the facility was

to be $2,000,000. The transaction was tentatively structured so that Santos and Velázquez

would pay $500,000 at the closing and then repay the balance of $1,500,000 over ten

years.[7] Thus, Forest would in effect be financing the purchase of the plant.

Shortly after negotiations began, Santos and Velázquez brought the other Plaintiffs

_____

[4] Docket no. 48, Affidavit of Kenneth Goodman (hereinafter "Goodman Affidavit"), at 3.

[5] Docket no. 48, Goodman Affidavit, at 3; exhibit C; exhibit DD, at 11.

[6] Docket no. 48, Goodman Affidavit, at 3-4; docket no. 51, Affidavit of Domingo Velázquez (hereinafter "Velázquez Affidavit").

[7] Docket no. 48, Goodman Affidavit, at 4; docket no. 51, Velázquez Affidavit.

Civil No. 98-1076 (HL)                    5

into the group to facilitate the raising of the $500,000 for the down payment.[8]  Plaintiffs

then began to visit government agencies and banks in order to obtain financing for the

down payment and permits for operating the plant.[9]  Plaintiffs and Forest continued to

engage in discussions, and a draft agreement was prepared.  However, by the end of

February 1997, a final agreement had not been reached by the parties.[10]

In February, Santos withdrew from the group of potential purchasers.[11]  He

informed Forest that he dropped out because he was concerned with the financial viability

of Sein Mendez operations and because he did not want to risk his own personal assets in

the purchase and operation of the plant.  Forest had considered Santos to be a key

participant in this group of potential buyers because he was knowledgeable on Sein

Mendez' operations and because he was the member of the group with the most financial

resources.[12]  Forest did not, however, have any objection to proceeding to deal with this

group which was now being headed up by Velázquez.[13]  Forest did inform Velázquez that

it would consider selling Sein Mendez to him and his group provided that they could

_____

[8]Docket no. 48, Goodman Affidavit, at 5-6;  docket no. 51, Velázquez Affidavit.

[9] Docket no. 51, Velázquez Affidavit;  exhibits A-G, I-L, N, Q, & S-V.

[10] Docket no. 48, Goodman Affidavit, at 6-7;  exhibit D.

[11] Docket no. 48, Goodman Affidavit, at 7;  docket no. 51, Velázquez Affidavit.

[12] Docket no. 48, Goodman Affidavit, at 7;  exhibit DD, at 36-37.

[13] Docket no. 51, Velázquez Affidavit.

Civil No. 98-1076 (HL)                     6

demonstrate that their operation would be profitable and would generate sufficient income

to pay off the balance of the purchase price.[14]  Velázquez asked Forest to reduce the

required up-front payment from $500,000 to $250,000, but Forest did not agree to this

request.[15]  In a letter dated March 14, 1997, Velázquez wrote to Kenneth Goodman,

Forest's vice president of finance, informing him that his group had raised $300,000, but

that they would need an extension of time to be able to successfully close negotiations.[16]

Plaintiffs and Forest, however, had not reached a final agreement on all terms and

conditions of a possible sale.[17]

       After Santos withdrew from Plaintiffs' group, Forest began to discuss the sale of

Sein Mendez with other parties.  By April 1997, Forest was negotiating with Saleh Yassin

of Creative Medical Corporation.[18]  Forest had not agreed to refrain from negotiating with

other parties.[19]  Plaintiffs were aware that they were not the only potential buyers of Sein

Mendez.[20]  Forest had never provided Plaintiffs with a first option, exclusive right, or right

---------------

[14] Docket no. 48, Goodman Affidavit, at 8.

[15] Docket no. 48, Goodman Affidavit, at 7-8 n.5;  docket no. 51, exhibit P.

[16] Docket no. 51, exhibit P.

[17] Docket no. 48, exhibits MM, NN, OO, PP, QQ, & RR.

[18] Docket no. 48, Goodman Affidavit, at 9-10.

[19] Docket no. 48, Goodman Affidavit, at 8-9;  exhibit FF, at 49.

[20] Docket no. 48, exhibit DD, at 64-65;  exhibit HH, at 56-58, 68-69;  & exhibit II,
(continued...)

Civil No. 98-1076 (HL)                    7

of first refusal to purchase Sein Mendez.[21]

In their statement of fact number 12, Plaintiffs contest Forest's assertion that it never gave Plaintiffs a first option, exclusive right, or right of first refusal to purchase. Plaintiffs' statement of facts, however, cites to no evidence on this issue; it states only, "See Memorandum of Law submitted by plaintiffs." As discussed above, such allegations or arguments by counsel are not sufficient, by themselves, to defeat summary judgment. *Nieves*, 7 F.3d at 276 n.9; *Lopez*, 938 F.2d at 1515-16 n.11. Moreover, Plaintiffs' allegation on this issue in their statement of fact is belied by the record. Velázquez, Carlos Matías, and Rafael Rodríguez admitted in their depositions that no one at Forest ever stated that Plaintiffs had any exclusive or first right to purchase Sein Mendez.[22] Moreover, all Plaintiffs in their response to Forest's requests for admissions admitted that there were no written documents or oral statements from Forest providing Plaintiffs with a first option, exclusive right, or right of first refusal.[23]

In a letter of March 14, 1997, to Kenneth Goodman, Velázquez confirms a telephone conversation he had with Goodman and states that during the conversation it was

---

[20](...continued)
at 9-11.

[21] Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; exhibit KK, at 19; exhibits MM, NN, OO, PP, QQ, RR.

[22] Docket no. 48, exhibit DD, at 68, 89; exhibit FF, at 48-50; & exhibit KK, at 19.

[23] Docket no. 48, exhibits MM, NN, OO, PP, QQ, & RR.

Civil No. 98-1076 (HL)                     8

discussed that "we continue to have the first option to buy Sein Mendez."[24]  In his

deposition, however, Velázquez admitted that these were his words, not Goodman's, and

that Goodman did not tell him they had the first option.[25]  Because of this admission in his

testimony and because of the Plaintiffs' responses to Forest's request for admissions, the

Court concludes that this letter is not sufficient to create a genuine issue as to whether

Forest gave Plaintiffs a first option to purchase Sein Mendez.

Thus, there were other parties negotiating with Forest to buy Sein Mendez and

Plaintiffs were aware of this competition.  While Forest and Plaintiffs never reached a final

agreement, Forest's negotiations with Yassin and Creative Medical Corp. had a different

outcome.  Creative Medical agreed to pay $1,875,000 for Sein Mendez.  Unlike the

proposed deal with Plaintiffs, however, the entire purchase price was to be paid at the

closing.  Forest would not be financing the transaction and therefore would not have to

concern itself with the ongoing profitability of the facility.[26]  While these negotiations with

Creative Medical were being concluded, Plaintiffs were obtaining the financing for the

$500,000 down payment that they intended to use for what they thought would be their

purchase of Sein Mendez.[27]  In a letter dated April 27, 1997, Velázquez informed

---

[24] Docket no. 51, exhibit P.

[25] Docket no. 48, exhibit DD, at 68-69.

[26] Docket no. 48, Goodman Affidavit, at 11.

[27] Docket no. 51, exhibits B & J.

Civil No. 98-1076 (HL)                    9

Goodman that Plaintiffs had accepted the sales offer, were ready to settle, and wished to

meet "to discuss and finalize several items of the negotiations."[28]  Within a day or two,

Rita Weinberger, Forest's director of the corporate audit department, informed Velázquez

that Forest was going to accept Creative Medical's offer.  She did tell him that the deal

with Creative Medical had not been finalized and that there was thus still a possibility that

Forest would sell Sein Mendez to Plaintiffs.  On May 8, 1997, Forest and Creative Medical

executed a purchase agreement for the sale of Sein Mendez.[29]

       Plaintiff's claim that Forest had allowed them until May 15, 1997, to obtain the

necessary financing.  Their support for this claim comes from two items in the record.  One

is Velázquez' affidavit in which he avers that "[A]t my request, Defendant extended the

deadline until May 15, 1997.  That at all times such deadline was essential and plaintiffs

rely [sic] on such date."  He also states that "[S]uch deadline (May 15, 1997) was imposed

by the defendant."[30]  His affidavit contains no further explanation on the scope or nature of

the deadline.  The other evidence in the record is a letter from Kenneth Goodman

addressed "To Whom It May Concern."  The letter states that Forest is discussing the sale

of Sein Mendez to Plaintiffs and that "It is Forest's intention to extend a deadline of May

---

[28] Docket no. 51, exhibit H.

[29] Docket no. 48, Goodman Affidavit, at 11-12;  exhibit K;  exhibit DD, at 77-79.

[30] Docket no. 51, Velázquez Affidavit.

Civil No. 98-1076 (HL)                    10

15, 1997, for the group to present their final proposal for the purchase of the business."[31]

Plaintiffs claim that Forest's sale of Sein Mendez to Creative Medical constituted a breach of Forest's duty to negotiate in good faith. In its motion for summary judgment, Forest argues that it never entered into an agreement with Plaintiffs to sell Sein Mendez to them; that Plaintiffs never had any exclusive or first rights to buy Sein Mendez; and that Forest did not act in bad faith in its negotiations. Forest further claims that if Plaintiffs' *culpa in contrahendo* claim is allowed to proceed, their damages should be limited to their reliance damages which amounted to only $2,000. Lastly, Forest argues that Velázquez is precluded from bringing a claim because he signed a release relieving Forest of liability. Plaintiffs have opposed the motion for summary judgment. For the reasons set forth below, the Court grants the motion for summary judgment.


## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this requirement, the nonmoving party has the burden of presenting any facts

---

[31] Docket no. 48, exhibit F.

Civil No. 98-1076 (HL)                    11

that demonstrate a genuine issue for trial. Fed. R. Civ. P. 56(e); *LeBlanc*, 6 F.3d at 841.

The nonmovant must do more than show "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106

S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is genuine when, based on the

evidence, a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the

plaintiff." *Id.* at 252, 106 S.Ct. at 2512.


   *1.     The culpa in contrahendo claim*

        Plaintiffs claim that Forest negotiated with them in bad faith and that therefore it is

liable to them under the *culpa in contrahendo* doctrine. This doctrine, which means "fault

in negotiating," has its origins in nineteenth century Germany. *See generally* Friedrich

Kessler & Edith Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of*

*Contract: A Comparative Study*, 77 Harv.L.Rev. 401, 401-04 (1964); *Whirlpool Corp. v.*

*U.M.C.O. Int'l Corp.*, 748 F.Supp. 1557, 1562-63 (S.D.Fla. 1990). Generally, it is used to

compensate a party for the expenses it incurred in reliance on the other party's offer to

form a contract when the contract negotiations break down. *Snyder v. Champion Realty*

*Corp.*, 631 F.2d 1253, 1255-56 (5th Cir. 1980). In Puerto Rico, a *culpa in contrahendo*

Civil No. 98-1076 (HL)                     12

cause of action is derived from Article 1802 of the Civil Code.  *Torres v. Gracia*, 119

P.R.Dec. 698, 703, 19 Official Translations 742, 746-47 (1987);  *Producciones Tommy*

*Muñiz, Inc. v. COPAN*, 113 P.R.Dec. 517, 528, 13 Official Translations 664, 677 (1982).

In *Tommy Muñiz*, the Puerto Rico Supreme Court recognized that a party is not obligated

to enter into a contract, but rather it is free to withdraw from negotiations.  113 P.R.Dec. at

526, 13 Official Translations at 676.  This breaking off of negotiations is not sufficient in

and of itself to create liability.  *Id.* at 530, 13 Official Translations at 680.

        The fact that two negotiating parties failed to come to a final agreement does not

mean that the withdrawing party is automatically free from liability.  Once a party enters

into contract negotiations, it has a duty to act in good faith towards the other side.  *Borg*

*Warner Int'l Corp. v. Quasar Co.* 95 J.T.S. 30, 723 n.9 (1995);  *Tommy Muñiz*, 113

P.R.Dec. at 526-27, 13 Official Translations at 676;  *Euromotion, Inc. v. BMW of North*

*America, Inc.*, 136 F.3d 866, 871-72 (1st Cir. 1998);  *Prime Retail, L.P. v. Caribbean*

*Airport Facilities, Inc.*, 975 F.Supp. 148, 152 (D.P.R. 1997).  A negotiating party may

incur *culpa in contrahendo* liability if its conduct is wrongful, fraudulent, or dolose.

*Tommy Muñiz*, 113 P.R.Dec. at 529, 13 Official Translations at 679.  In determining

whether a party is liable for its conduct during negotiations, the court should consider

> (1) the development of the negotiations, (2) how did they begin, (3) their course, (4)
> the conduct of the parties throughout them, (5) the stage at which the interruption
> took place, (6) the parties' reasonable expectations to form a contract, as well as any
> other relevant circumstance under the facts of the case.

*Torres*, 119 P.R.Dec. at 705, 19 Official Translations at 749 (quoting *Tommy Muñiz*, 113

Civil No. 98-1076 (HL)                13

P.R.Dec. at 530, 13 Official Translations at 680); *Euromotion*, 136 F.3d at 871 n.2. This

doctrine should be applied restrictively. *Torres*, 119 P.R.Dec. at 710, 19 Official

Translations at 754. Examples of liability-creating conduct would include a party's failure

to disclose its lack of legal capacity to enter into a contract; a party's negotiating without

any intent of entering into a contract but with the intent of obtaining confidential business

information from the other side; a party's using the negotiations not in order to finalize an

agreement but to obtain some advantage in its dealings with a third party; or a party's fault

causing the business transaction to be ineffective. *Tommy Muñiz*, 113 P.R.Dec. at 529, 13

Official Translations at 679.

        In the case before the Court, the negotiations between Forest and Plaintiffs were

begun in October 1996 and were ongoing up through the end of April. Despite the length

of time that the parties had been discussing the possible sale, there is no evidence that a

final agreement had been reached. In fact, the record indicates the opposite -- that there

were still points that the parties needed to resolve.[32] Plaintiffs had received approval for

their requested financing and thus would have been able to provide the $500,000 required

for the down payment. There is no evidence, however, that Forest and Plaintiffs ever

reached an agreement on the business plan that Plaintiffs were proposing for the operation

of Sein Mendez. Given that the balance of the purchase price was to be paid after

---

        [32] Docket no. 48, Goodman Affidavit, at 6-7; exhibits MM, NN, OO, PP, QQ, &
RR; docket no. 51, exhibit H.

Civil No. 98-1076 (HL)                    14

Plaintiffs took over the managing of Sein Mendez and that, presumably, this balance would

be paid off with earnings from the business, the exact nature of Plaintiffs' business plan

was a significant part of the negotiations.  Although the parties had been negotiating for

approximately six months, the evidence in the record indicates that this major issue was

still left to be resolved.  Thus, with regard to the course and development of the

negotiations, the record indicates that they were still far from complete.

Plaintiffs claim that they expected to be the buyers of Sein Mendez.  The record

indicates that Forest was considering offers from other parties and that Plaintiffs were

aware that they had competition.  Additionally, Plaintiffs have admitted that they had no

first option, exclusive right, or right of first refusal to purchase Sein Mendez.[33]  Moreover,

as discussed above, Plaintiffs had not yet finalized the terms of the purchase agreement

with Forest.  Thus, although they may have had expectations to be the buyers of Sein

Mendez, it is not clear that these were reasonable expectations.

Forest's conduct might give rise to liability if it failed to inform Plaintiffs of its lack

of legal capacity to enter into a contract;  if it negotiated without any intent of entering into

a contract with Plaintiffs, but only with the intent of obtaining confidential business

information from them;  or if it used the negotiations not to finalize an agreement with

Plaintiffs, but rather to obtain an advantage in its dealings with a third party.  *See Tommy*

---

[33] Docket no. 48, exhibit DD, at 68, 89;  exhibit FF, at 48-50;  exhibit KK, at 19; exhibits MM, NN, OO, PP, QQ, & RR.

Civil No. 98-1076 (HL)                    15

*Muñiz*, 113 P.R.Dec. at 529, 13 Official Translations at 679. Here the record contains no indication that Forest engaged in such conduct. There is no evidence that it obtained any advantage through its discussions with Plaintiffs, with Creative Medical, or with any other third party. Nor does the record indicate that Forest ever negotiated with Plaintiffs once it knew that it would be selling Sein Mendez to Creative Medical. From the record it appears that Forest began negotiating with Creative Medical while discussions with Plaintiffs were ongoing and that the negotiations with Creative Medical came to fruition before the discussions with Plaintiffs could be finalized. There is no evidence that Forest engaged in deceptive or fraudulent behavior in its negotiations with Plaintiffs.

*Culpa in contrahendo* liability may exist if the failure of the transaction is due to some fault or bad faith on the part of the party that withdrew from the negotiations. *Id.* A party may be subject to liability if its withdrawal was arbitrary or unjustified. *Id.* at 529, 13 Official Translations at 678-79 (quoting B. Moreno Quesada, *La Oferta de Contrato* 45-46 (1963)). In the present case, it is undisputed that Forest was confronted with two potential buyers: Plaintiffs and Creative Medical. The sale to Creative Medical was for $1.875 million, which was paid at the closing. A sale to Plaintiffs would have netted Forest, by contrast, only $500,000 at the closing. Forest would then have had to finance the remaining $1.5 million over ten years. It is also undisputed that Sein Mendez had not been a money-making operation in recent years. Thus, the prospect of extending $1.5 million in credit to Plaintiffs was far from a risk-free proposition. Courts have held that a

Civil No. 98-1076 (HL)                    16

party's economic ability to finance a project -- or lack thereof -- is a legitimate factor to

consider in determining whether a refusal to deal with that party is justified.  *See Torres*,

119 P.R.Dec. at 707, 19 Official Translations at 751; *Vila & Hnos., Inc. v. Owens Illinois

de P.R.*, 117 P.R.Dec. 825, 836 n.15, 17 Official Translations 987, 1001 n.15 (1986).  The

*culpa in contrahendo* doctrine does not oblige a seller to forego a more lucrative offer from

party B merely because party A had been negotiating with it first.  Rather, the doctrine

compels the seller to negotiate in good faith with both parties A and B.  In the present case

Forest accepted an offer from Creative Medical that was certainly less risky and probably

more lucrative than the tentative terms of sale to Plaintiffs.[34]  There is no evidence that

Forest acted in bad faith by choosing not to sell Sein Mendez to Plaintiffs.

There is evidence in the record of a May 15, 1997, "deadline" that Forest had

extended to Plaintiffs in the parties' negotiations.[35]  Plaintiffs make much of this deadline

and the fact that Forest sold Sein Mendez to Creative Medical before the deadline had

expired.  While there is evidence of a deadline, the record is devoid of any indication of its

---

[34] The proposed financing by Forest of the $1.5 million balance of the purchase price was to be over a period of ten years.  The exact terms of this financing were never finalized, and it is thus not possible to determine with precision whether the sale to Plaintiffs would have been more or less lucrative for Forest than the sale to Creative Medical.  Because Creative paid the entire $1.875 million price up front, it seems highly probable that the present value of this amount would exceed the present value of the amount that Forest would have received from Plaintiffs over the course of the ten years of financing.

[35] Docket no. 48, exhibit F;  docket no. 51, Velázquez Affidavit.

significance.  It is not clear what this was a deadline for.  Plaintiffs have admitted that they

did not have a first option, exclusive right, or right of first refusal to purchase Sein

Mendez.[36]  Therefore, this deadline could not have been for a term during which Forest

would only consider selling to Plaintiffs.  In fact, it is undisputed that Forest was

discussing the sale to other parties before May 15, 1997.  There is no evidence that this

deadline was indicative of a term during which Forest committed itself to considering only

Plaintiffs' offer.  While there may have been a deadline,  its significance and any

constraints it put on the parties is unclear.  It does not seem likely that this deadline

indicated that Forest was obliged to deal only with Plaintiffs in the period leading up to

May 15, 1997.  Rather, it seems more likely that May 15, 1997, was the last date when

Forest would consider selling to Plaintiffs.

       The imposition of *culpa in contrahendo* liability must be done so restrictively.

*Torres*, 119 P.R.Dec. at 710, 19 Official Translations at 754.  In the present case, Forest

engaged in negotiations with Plaintiffs for the sale of Sein Mendez, and the parties had

reached a tentative, but not final, structuring of a sale.  These tentative terms provided that

Forest would finance three-fourths of the purchase price.  Forest was thus assuming a risk -

- the risk of default.  Given that Sein Mendez had not been profitable in recent years, this

was a not insignificant risk.  Plaintiffs did not, however, have an exclusive or first right to

---

[36] Docket no. 48, exhibit DD, at 68, 89;  exhibit FF, at 48-50;  exhibit KK, at 19;
exhibits MM, NN, OO, PP, QQ, & RR.

Civil No. 98-1076 (HL)                    18

purchase Sein Mendez, and Forest entered into negotiations with a third party. This party

ultimately offered to pay the entire purchase price up front. These terms were certainly

more favorable to Forest than the ones proposed by Plaintiffs. Forest's decision to sell to

this third party thus was not arbitrary or unjustified. There is no indication that during the

discussions, Forest deceived Plaintiffs, obtained some unfair advantage from the

negotiations, or otherwise acted in bad faith. There is no genuine issue of fact to support

the *culpa in contrahendo* claim. Accordingly, the Court must grant summary judgment on

this issue.[37]

2.    *Velázquez' release*

There is an alternative ground for dismissing the claims of Velázquez. As part of

Forest's extrication from its Sein Mendez operations, it entered into severance agreements

with a number of the facility's employees. Velázquez was one of these employees. As

---

[37] The spouses and conjugal partnerships of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodríguez Rivera are also plaintiffs. The claims of these plaintiffs are derivative of the *culpa in contrahendo* claims of Velázquez, Carlos Matías Maldonado, Luis Pérez Aviles, and Rafael Rodríguez Rivera. Thus, they too must be dismissed. Even if the Court had denied the motion for summary judgment on the *culpa in contrahendo* claims, these derivative claims would have been dismissed. *See Satellite Broadcasting Cable, Inc. v. Telefonica de España*, 786 F.Supp. 1089, 1096 (D.P.R. 1992) (In *culpa in contrahendo* claim, no cause of action exists for parties not participants in the negotiations).

Civil No. 98-1076 (HL)                    19

part of his agreement he received $100,000 in severance pay.[38]  In consideration,

Velázquez executed a general release.  In paragraph 2 of the release he agreed that he and

his spouse

> do not have, and if they had will not pursue, before any federal, state or Puerto Rico
> court or administrative agency, *any claim of any nature whatsoever*, including *but
> not limited to* those related with, or that can be alleged to have occurred from the
> employment relationship with Forest, or the termination of this relationship, and
> *execute the most complete release for any claim or cause of action which they have
> or may have had* or could have had, whether at law or in equity, in contract,
> damages, against Forest . . . .[39]

Elsewhere the release states as follows:

> 3.    Forest, the Corporations and their Representatives are released and
> forever exonerated of *all claims*, allegations, actions, causes of action and/or
> Amended Complaints at law or in equity, for *any concept* that Velázquez may have
> or could have had against any of them.
>
> *       *       *       *
>
> 13.    The parties agree that they have executed this document freely,
> voluntarily and without any coercion or intimidation of any kind whatsoever, and
> that it is the complete agreement between them and that no representation other than
> those herein stated have been made.[40]

The release was executed on May 27, 1997, after Plaintiffs had unsuccessfully attempted

to purchase Sein Mendez and after Forest had sold Sein Mendez to Creative Medical.[41]

---

[38] Docket no. 48, Goodman Affidavit, at 13;  exhibits L & M.

[39] Docket no. 48, exhibit M (emphasis added).

[40] Docket no. 48, exhibit M (emphasis added).

[41] Docket no. 48, exhibit M.

Civil No. 98-1076 (HL)                20

Velázquez consulted with an attorney before signing this release.[42]  In his affidavit

submitted with Plaintiffs' opposition to the motion for summary judgment, he claims that

he intended that the release only relieve Forest of liability for claims arising out of his

employment at Sein Mendez.[43]

       Under the Puerto Rico Civil Code, the court should enforce the literal meaning of a

contract whose terms are clear.  P.R. Laws Ann. tit. 31, § 3471 (1991);  *Unisys v. Ramallo*

*Brothers*, 128 P.R.Dec. 842, 852 (1991).  When the agreement is clear and unambiguous,

the court should ignore parole evidence and should enforce the terms of the contract.

*Marina Indus., Inc. v. Brown Boveri Corp.*, 114 P.R.Dec. 64, 72, 14 Official Translations

86, 97-98 (1983);  *Borschow Hosp. & Medical Supplies, Inc. v. Cesar Castillo, Inc.*, 96

F.3d 10, 15-16 (1st Cir. 1996).  This is especially true when an unambiguous contract has a

provision stating that the contract constitutes the entire agreement between the parties.  *See*

*Borschow Hosp.*, 96 F.3d at 16.  The court may consider extrinsic evidence only if the

relevant terms of a contract are unclear.  *Executive Leasing v. Banco Popular de Puerto*

*Rico*, 48 F.3d 66, 69 (1st Cir. 1995).

       In the case before the Court, Velázquez' release clearly provides that he relieves

Forest of all liability for "any claim of any nature whatsoever"  and that the agreement

constitutes "the most complete release for any claim or cause of action" which he may

_____

       [42] Docket no. 48, exhibit DD, at 92.

       [43] Docket no. 51, Velázquez Affidavit.

Civil No. 98-1076 (HL)                    21

have.  The release also contains an integration clause stating that the agreement with Forest

"is the complete agreement between them" and that there is no other representation other

than those contained in the release.  This broad language does not bode well for any claim

that Velázquez now may seek to bring against Forest.  Furthermore, in their opposition,

Plaintiffs do not point to any ambiguity in the release that would allow the Court to

consider extrinsic evidence regarding Velázquez' intent when he signed the agreement.

Moreover, Velázquez held the position of controller at Sein Mendez and was the leader of

Plaintiffs' group in their attempt to purchase the company.  Thus, he cannot claim to be an

unsophisticated person unaware of what he was signing.  At any rate, he had the benefit of

advice from counsel prior to signing the agreement.  Because the general release executed

by Velázquez contains broad and clear language relieving Forest of liability and because

Plaintiffs fail to point to any ambiguity in the release, the Court may not consider extrinsic

evidence in interpreting the release.  Its terms, therefore, must be enforced.  Velázquez,

thus, may not bring this claim against Forest.  The Court grants summary judgment on this

alternative ground as well.[44]

WHEREFORE, the Court hereby **grants** Forest's motion for summary judgment

(docket no. 48).  Judgment shall be entered accordingly dismissing this case with

---

[44] Because the Court grants Forest's motion for summary judgment for the reasons
discussed in this opinion and order, it is unnecessary for the Court to consider Forest's
additional argument that the maximum amount of damages that Plaintiffs can claim is
$2,000.

AO 72A

Civil No. 98-1076 (HL)                    22

prejudice.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, January 26, 2000.

                                        HECTOR M. LAFFITTE
                                        Chief U.S. District Judge